# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00690-CV

**Benjamin Zieger, Appellant**

**v.**

**Texas Department of Family and Protective Services,[1] Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. FM206328, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Benjamin Zieger appeals from the trial court order terminating his parental rights to his son T.P.Z. *See* Tex. Fam. Code Ann. § 161.001(D), (E), (N), (Q) (West 2002) (hereafter, Fam. Code § __).  We will affirm the trial court's judgment.

### Factual and Procedural Background

Lauri Ragland was eighteen and in high school when she met Benjamin Zieger in early summer 2001.  Two weeks after they met, she moved in with him.  Shortly thereafter, she was pregnant.  Benjamin Zieger's life had been troubled: he had a long history of burglary and had spent time in a mental institution for threatening to kill his sister.  He had moved around considerably.  In

---

[1]    *See* Act of June 2, 2003, 78th Leg., R.S., ch. 198, art. 1, § 1.01(a), 2003 Tex. Gen. Laws 611, 611 (changing name for Texas Department of Protective and Regulatory Services).

his words, he admitted "messing around" with many women. Ragland says Zieger knew by September that she was pregnant; he says he did not know until December.

Ragland claimed that in the period between September and December Zieger would push her down, choke her, and kick her. She testified that he had been physically and emotionally abusive to her. Zieger continued committing burglaries, self-described as a "burglary spree." He burglarized a fireworks stand in late December 2001, was arrested and later convicted,[2] and sentenced to fifteen years in prison.

T.P.Z. was born in May 2002. Ragland and Zieger no longer lived together. Ragland began using drugs again, and failed to take care of the baby. Ragland brought T.P.Z. to Brackenridge Hospital, where he was found to have a fractured femur and possibly two to three other fractures as well as bruising. Dr. Karen Hasland, the treating pediatrician, said that the broken femur was the result of abuse. The Child Protective Services Division (CPS) of the Department of Family and Protective Services (the Department) took custody of T.P.Z.[3] Ragland at first attempted to follow the family reunification plan, but eventually decided to relinquish her parental rights. The Department then sued Zieger, alleging multiple grounds for termination. *See id*.

---

[2] Zieger was serving his third term in prison. This was his fifth conviction, however, as some of his sentences had run concurrently. He was on parole at the time he was arrested.

[3] In June 2002, the Department received a report alleging sexual abuse of T.P.Z. based on a positive test for chlamydia. It turned out that T.P.Z. acquired the chlamydia from his mother at birth. During the time period in which the fractures would have occurred, several people had access to T.P.Z.: Ragland's then boyfriend; Ragland's roommate, boyfriend, and nine-year old daughter; as well as Margaret Zieger (Zieger's mother), and her partner. The Department never established who committed the abuse.

Zieger brings five issues on appeal: the evidence was legally and factually insufficient to support any of the grounds for termination of Zieger's parental rights and to support the finding that termination was in the child's best interest (one and two); the court should have granted a mistrial based on a prejudicial remark overheard by a juror (three); the court erred in submitting a broad-form jury charge (four); and trial counsel provided ineffective assistance (five).

## Discussion

### *Standard of Review for Termination*

Texas courts have long recognized that the natural right existing between a parent and a child is one of constitutional dimensions. *Ex parte Godeke*, 355 S.W.2d 701, 702 n.1 (Tex. 1962). But the "rights of natural parents are not absolute; protection of the child is paramount . . . ." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. Fam. Code § 161.206(a) (West 2002 & Supp. 2004-05); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). The clear and convincing standard imposes a higher burden because of the severity and permanency of terminating the parent-child relationship. On appeal, then, an appellate court must also have a higher standard when reviewing the legal and factual sufficiency of the evidence. *Id*. at 264-65; *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

In reviewing the legal sufficiency of the evidence to support a termination finding, this Court looks at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d at 266. In so doing, we presume that the fact-finder settled disputed facts in

3

favor of the finding if a reasonable fact-finder could do so. *Id*. And we disregard all evidence that a reasonable fact-finder could have disbelieved or found incredible. *Id*.

When reviewing the factual sufficiency of the evidence supporting a termination finding, we inquire as to whether all the evidence, both in support of and contrary to the trial court's finding, is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the allegations. *In re C.H.*, 89 S.W.3d at 27-29. Further, we consider whether the disputed evidence is such that a reasonable fact-finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. If the disputed evidence is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

Section 161.001 of the Texas Family Code permits a court to order termination of parental rights if two elements are established. First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. Fam. Code § 161.001(1). Second, termination of the relationship must be in the best interest of the child. *Id*. § 161.001(2).

***Grounds for Termination***

The Department brought four grounds for termination: that appellant knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; that appellant has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child; that appellant constructively abandoned the child; and, that appellant has knowingly engaged in criminal conduct that has resulted in conviction of an offense, imprisonment

4

for not less than two years, and inability to care for the child. *See* Fam. Code § 161.001(1)(D), (E), (N), (Q). Zieger contends that the evidence was factually and legally insufficient to support any ground of termination. We will first discuss the two "endangerment" grounds.

**Subsections D, E**

Zieger challenges the sufficiency of the evidence supporting the trial court's findings that he knowingly placed or allowed T.P.Z. to remain in conditions or surroundings that endangered his well-being or knowingly allowed T.P.Z. to remain with persons who engaged in conduct that endangered him. *See* Fam. Code § 161.001(1)(D), (E). To prove endangerment under subsection D, the Department had to prove that Zieger (1) knowingly (2) placed or allowed the child to remain (3) in conditions or surroundings that endangered his physical or emotional well-being. *Id*. § 161.001(1)(D). Under subsection E, the Department had to prove that Zieger (1) engaged in conduct or knowingly placed the child with persons who engaged in conduct (2) which endangered his physical or emotional well-being. *Id*. § 161.001(1)(E). Under subsection D, the danger to the child results from the child's environment, while under subsection E, the parent's conduct is the source of the danger to the child. *In re D.C.*, 128 S.W.3d 707, 715 (Tex. App.—Fort Worth 2004, no pet.); *Robinson v. Texas Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

A parent's repeated criminal acts may constitute sufficient evidence of conduct that endangers the well-being of a child. *In re J.N.R.*, 982 S.W.2d 137, 143 (Tex. App.—Houston [1st Dist.] 1998, no pet.), *disapproved on other grounds*, *C.H.*, 89 S.W.3d at 24-25; *see also In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.); *Allred v. Harris County Child Welfare Unit*,

5

615 S.W.2d 803, 806 (Tex. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). Illegal drug use in the child's household constitutes surroundings that endanger the well-being of the child under subsection D. *See D.C.*, 128 S.W.3d at 715-16; *In re S.D.*, 980 S.W.2d 758, 763 S.W.3d 707, 715 (Tex. App—San Antonio 1998, pet. denied). Violent or abusive conduct by someone within the household also constitutes an environment that endangers children. *K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied); *D.C.*, 128 S.W.3d at 715; *Director of Dallas County Child Protective Servs. Unit v. Bowling*, 833 S.W.2d 730, 733 (Tex. App.—Dallas 1992, no writ); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied); *Ziegler v. Tarrant County Child Welfare Unit*, 680 S.W.2d 674, 678-79 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.).

The fact-finder may consider both the acts and the omissions of the parent. *Allred*, 615 S.W.2d at 370. A fact-finder may infer from past conduct endangering the well-being of a child that similar conduct will recur if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, no pet.).

Zieger had engaged in an almost lifelong pattern of criminal conduct. At the time he began his relationship with Ragland, he was on parole for burglary and had reason to know the consequences of committing further crimes, not only in a return to incarceration but also the probability of ever-longer sentences that would prevent him from being a part of his child's life. Nevertheless, he not only re-offended once, but went on a self-described burglary "spree." Further, while serving his sentence, he was disciplined for destroying property and distilling alcohol. This course of conduct endangered T.P.Z.'s emotional well being. *See Allred*, 615 S.W.2d at 806 (robberies that resulted in parole revocation endangered emotional well-being of child).

6

Zieger was in jail when his child was born. This left only one parent, T.P.Z.'s mother, to take care of him. Zieger was aware of Ragland's unstable lifestyle, history with drugs, and attempts to harm herself. In fact, he testified that when he was around, he would not allow her to use drugs. The environment in which T.P.Z. was left endangered his well-being in a more than "metaphysical" way. T.P.Z. suffered a fracture, and on admission to the hospital, was discovered to have several other fractures in various stages of healing and fading bruises. These injuries were classified as "not accidental trauma," which Dr. Karen Hasland, the treating pediatrician, agreed was a "nice word for child abuse."

Zieger contended that he tried to intervene in Ragland's situation and had instructed his mother to have T.P.Z. and his mother live with her. However, they apparently did not do so on a full-time basis. It is not clear who committed the abuse: it appears that T.P.Z. was left in a chaotic environment with multiple adults having access to the child.

In addition to the conduct of the others with whom Zieger left T.P.Z. actually causing harm to him, there was testimony in the record that would support the proposition that Zieger's conduct itself also posed a danger to T.P.Z. There was testimony from Ragland about the abuse she suffered, even after she was pregnant. Zieger had attempted to murder his sister and engaged in a variety of other violent behaviors. He described himself as "having no conscience." His mother testified that Zieger had been diagnosed as a "sociopath." Demonstrated violence toward family members leads to a logical inference that he would be violent towards the child.

7

The termination of Zieger's parental rights is based on much more than "mere imprisonment" as he argues.[4] Zieger's conduct in repeatedly committing crimes led to his incarceration and resulted in his leaving the child in an environment that endangered the well-being of the child. Viewing the evidence in the light most favorable to the finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that the finding that subsections E and F applied to Zieger was true. Further, no disputed evidence is so significant that the fact-finder could not have reasonably formed a firm belief or conviction that the allegations were true.

**Subsection Q**

One basis on which the court may order termination is that the parent has "knowingly engaged in criminal conduct that results in the parent's imprisonment and inability to care for the child for not less than two years from the date of filing the petition." Fam. Code § 161.001(1)(Q). Zieger contends that the court used the improper date to calculate the relevant time period and he produced evidence of his ability to care for the child. Accordingly, he urges, the Department failed to prove this ground by clear and convincing evidence.

---

[4] Zieger relies heavily on *In re D.T.*, 34 S.W.3d 625 (Tex. App.—Fort Worth 2000, pet. denied). In *D.T.*, the appellant was arrested for writing bad checks. *Id*. at 628. Appellant called child protective services because she had no family in town and could not make bail. *Id*. The caseworker testified that D.T. was healthy and well-nourished and she had no reason to believe the child was abused or neglected. *Id*. The caseworker testified that the only reason for emergency placement was that appellant could not make bond. *Id*. The caseworker later testified that appellant did everything she could while in jail to comply with the service plan. However, appellant's parental rights were terminated. *Id*. at 629. Even under these much more benign circumstances, the appellate court found the evidence legally sufficient, but factually insufficient to support the finding that appellant engaged in conduct endangering the physical and emotional well-being of the child. *Id*. at 642.

Incarceration alone does not justify termination. *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re Caballero*, 53 S.W.3d 391, 395 (Tex. App.—Amarillo 2001, pet. denied). Accordingly, the "care" contemplated by subsection Q encompasses arranging for care to be provided by another. *Caballero*, 53 S.W.3d at 396. Once the Department has established the first prong of subsection Q, the parent must produce some evidence as to how he or she would provide or arrange to provide care for the child during the period of incarceration. *Id*. at 396. When that burden of production is met, the Department then has the burden of persuasion that the arrangement would fail to satisfy the parent's duty to the child. *Id*.

Zieger complains that the Department did not show that he would be incarcerated for the necessary two years. He contends that the controlling date was that of the original petition, not the amended petition, filed ten months later. Zieger did not object and thus failed to preserve error. Even so, Zieger had received a fifteen-year sentence for burglary; his mandatory release date was in 2008. Zieger was incarcerated for his third time on his fifth felony offense. He admitted he had never been released before the mandatory release date.

Zieger contends that he had shown his ability to care for T.P.Z. through his mother, Margaret Zieger, or his girlfriend, Rebecca Tobey. Zieger also testified that he was thinking about leaving T.P.Z. in foster care until Zieger was able "to parent him."

CPS performed a home study on Margaret Zieger. She was not approved as a placement option for T.P.Z., principally based on health issues that would make taking care of an infant difficult. She had severe diabetes, which needed significant medical intervention. She also had a spinal cord injury which impaired her ability to walk; she often used a wheelchair. Further,

9

her partner, Penny, had had a recent conviction for driving while intoxicated and there were some concerns about her mental health; she was the one who helped care for Margaret and would be in the household with T.P.Z.

Zieger testified at trial that he planned to marry Tobey, who he first met around the time T.P.Z. was born. (Zieger and Ragland had separated by the time T.P.Z. was born.) Zieger testified that he had not been to Tobey's current residence. He knew that Tobey lived there with her daughter and "a guy named Chris." Zieger admitted that Chris might be Tobey's boyfriend. He had met but, "didn't really know," Tobey's mother and father. Tobey had "seen" T.P.Z., but he would not know her.

Tobey did not appear at trial. There is no testimony from her, either at trial or in the form of pre-trial discovery on file, that she is willing or able to care for T.P.Z. Zieger apparently did not suggest her name until after his mother's home study resulted in a decision from the Department that placement with his mother was not appropriate. Zieger and Tobey were not married and they had no definite date set. Further, at one point, Zieger's attorney informed the court that Tobey may have had "CPS involvement."

As noted in *In re A.V.*, 113 S.W.3d 355, 360 (Tex. 2003), "[I]f the parent is convicted and sentenced to serve at least two years and will be unable to provide for his or her child during that time, the State may use subsection Q to ensure that the child will not be neglected." Further, "the purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children . . . ." *Id*. at 361. Zieger cannot frustrate the purpose of this section to ensure against the child's neglect and meet his burden of showing how he would care for the child by simply

10

tossing out name after name. Viewing the evidence in the light most favorable to the finding, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that the finding that subsection Q applied to Zieger was true. Further, no disputed evidence is so significant that the fact-finder could not have reasonably formed a firm belief or conviction that the allegations were true. Accordingly, we hold the evidence legally and factually sufficient to support this ground of termination as alleged by the Department.

A court may order termination if two elements are established: the parent has engaged in any one of the acts or omissions itemized in the first subsection of the statute, *see* Fam. Code § 161.001(1), and termination is in the best interest of the child. *Id.* § 161.001(2). We turn now to an analysis of the best interest of the child.[5]

### Best Interest

Zieger contends that the evidence is legally and factually insufficient to support the trial court's finding that termination is in the child's best interest. A strong presumption exists that the best interest of the child is served by maintaining the parent-child relationship. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980). In determining the best interest of the child, a number of factors may be considered, including the following: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parenting abilities of the person seeking custody; (5) programs available to assist

---

[5] We have affirmed three grounds for termination; the statute only requires one. Accordingly, we do not address the "abandonment" ground. *See* Fam. Code § 161.001(N).

those persons in promoting the best interest of the child; (6) plans for the child by those individuals or by the agency seeking custody; (7) stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The absence of evidence about some of these considerations will not preclude a fact-finder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d at 27. But the existence of scant evidence as to each *Holley* factor will not support such a finding. *Id*. In a termination suit, our sole focus is the best interest of the child, not the parent. *D.O. v. Texas Dep't of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ).

T.P.Z. was too young to express any desires in this case. Of course, his only relationship with his father had consisted of a few, brief visits in jail. The present and future physical and emotional danger to the child, Zieger's parenting ability, and the acts or omissions which show an inappropriate relationship are intertwined factors.

Zieger had a violent history. He admitted to threatening to kill his sister and another person. He had disciplinary violations in jail. By his own admission, he stole less for the value of the items and more for the thrill of it. He described himself as "having no conscience." His mother said that he had been diagnosed as a "sociopath." This kind of violent behavior, including domestic violence toward T.P.Z.'s mother, and inability to check his impulses are behaviors that could endanger the child, both physically and emotionally.

Zieger also claimed that he "changed completely" as soon as he knew he was going to be a father. He thought that he should have the chance to parent T.P.Z. when he was released from jail.[6] However, at least according to Ragland, he continued to abuse her and steal well after she told him she was pregnant. His criminal conviction resulted in his leaving T.P.Z. with Ragland. Zieger admitted he knew that Ragland was unstable and had a drug problem. He claimed he kept her off drugs while she was living with him. In essence, Zieger's criminal behavior left T.P.Z. in an environment in which he suffered physical injury.

Zieger was asked if he had had any experience with children. He claimed that he had been married and had two children that he had parented as infants. He said that his wife and children died in an accident caused by a drunk driver. However, an investigator for Travis County and the custodian of records for the Department of Public Safety each testified to being unable to verify an accident at that location within that time frame or find any death records under the wife's or children's names. The only information that the Travis County investigator could find was an arrest record for shoplifting in another state for a woman with the same name. The jury could well have disbelieved that Zieger had produced any credible evidence of his parenting abilities. Of course, Zieger's ability to support his child while in jail was questionable. Further, all of the above

---

[6] "It may well have been in appellant's best interest to continue to have limited access to the children but the evidence is legally and factually sufficient to support the trial court's decision that it was in the children's best interest to terminate appellant's parental rights in order to make possible their future adoption." *Spurlock v. Texas Dep't of Protective and Regulatory Servs.*, 904 S.W.2d 152, 159 (Tex. App.—Austin 1995) (citing *In re D.O.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ)), *rev'd in part on other grounds*, *In re C.H.*, 89 S.W.3d 17, 26 (2002) (standard of appellate review).

13

behaviors could lead the jury to believe that he would not be able to develop a mature, appropriate relationship with T.P.Z. that would provide stability for the child.

There was testimony concerning the plan for T.P.Z. and the stability of the proposed placement. Emily Miller, his CPS caseworker, testified that T.P.Z. was doing well in foster care. He was on schedule developmentally, received appropriate medical care, had suffered no more injuries, and was described as a happy child. The foster parents wanted to adopt T.P.Z., thus providing him with stability. They had cared for other children and were able to provide a stable home. Miller testified that adoption was in his best interest. Ragland and her mother thought that adoption by the foster family was in T.P.Z.'s best interest.

Accordingly, we conclude that the trier of fact could have found by clear and convincing evidence that termination of Zieger's parental rights was in T.P.Z.'s best interest. Having found both legally and factually sufficient evidence to support a ground of termination and that termination was in T.P.Z.'s best interest, we overrule issues one and two.

### *Juror Incident*

In his third issue, Zieger contends that the trial judge abused her discretion in denying his motion for mistrial and his motion for new trial based on a juror's overhearing a remark prejudicial to Zieger. As the juror walked through a hallway, she overheard Susan Ragland, Lauri's mother, say, "I'm afraid for my daughter because if he gets out of prison, he's going to kill her. He may kill her." The juror immediately reported the incident to the bailiff. The juror was questioned

14

in front of the judge, with all counsel present to ask questions about the impact the incident had on her and whether it would prejudice her against Zieger.

The juror was wearing her juror identification tag. The juror said that Susan Ragland was standing in a group of people. She formed the impression that Susan Ragland's voice was deliberately raised; in part because the juror said she would have lowered her voice under the circumstances. The juror said that the remark would not prejudice her and that she could remain fair and impartial. She said that she had not and would not mention the incident to the other jurors. The judge accepted her answers and overruled Zieger's motion for mistrial. The judge noted on the record that she thought the remark would not influence the juror because the juror had followed instructions about reporting the incident and so would follow instructions not to talk about it. She also noted that any influence might not work against Zieger because the juror thought Susan Ragland was deliberately trying to influence her and seemed offended by that act.

After the conclusion of the trial, Zieger filed a motion for new trial based on this incident. He claimed that because the juror ended up voting against him, he was prejudicially injured by the incident. The court found that Zieger was not injured by the communication and overruled the motion for new trial.

Communication with a juror is considered jury misconduct. *See* Tex. R. Civ. P. 327(a). In order to grant a new trial based on that misconduct, the court must find that the communication occurred, that the communication was material, and that this communication, when viewed in light of the record as a whole, probably resulted in injury. *Id*. On review, we must decide

15

whether the trial court abused its discretion in denying the motion for new trial based on a jury issue. *See Pharo v. Chambers County*, 922 S.W.2d 945, 946 (Tex. 1996).

Zieger had the burden of proving that probable injury occurred. *See Branham v. Brown*, 925 S.W.2d 365, 369 (Tex. App.—Houston [1st Dist.] 1996, no writ) (complaining party has burden to show harm resulted from the alleged misconduct). To show that harm actually resulted from the alleged misconduct, "there must be some indication in the record that the alleged misconduct most likely caused a juror to vote differently than he would otherwise have done on one or more issue vital to the judgment." *Pharo*, 922 S.W.2d at 950.

Zieger argues that he was harmed because this juror voted against him. He also argues that this juror might have been subconsciously prone to making prejudicial remarks in jury deliberation. However, this second argument is speculative, and cannot form the basis for a grant of a new trial. Jurors cannot testify to matters occurring during deliberations, only to outside influences. *See Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 371 (Tex. 2000); *Hines v. State*, 3 S.W.3d 618 (Tex. App.—Texarkana 1999, pet. ref'd).

The overheard communication involved a concern that Zieger would kill Ragland whenever he was released from jail. Were this the only hint concerning violent behavior on Zieger's part that was in front of at least one juror, Zieger's argument would carry more weight. However, the jury[7] had ample other evidence, including Zieger's own testimony, about his violent actions. He testified that he had spent time in a mental institution for threatening his sister. He also said that he

---

[7] There is no evidence that the overheard remark or its substance was conveyed to the other jurors at any time.

16

threatened to kill a man he thought was having a sexual relationship with Ragland. He testified that he had pushed Ragland to the floor one time and, on another occasion, he put his foot on her while she was down and "pushed." He had several previous felony convictions and admitted to having committed more burglaries than those for which he was convicted. He described himself as having no conscience. He also admitted to several disciplinary incidents in jail, including manufacturing and distilling alcohol in prison. Ragland said Zieger was "a different person" when he got mad. The overheard information was in line with other information about Zieger's tendency toward violence.

Zieger has not met his burden to demonstrate harm from the remark. Accordingly, we cannot say that the court abused its discretion in overruling the motion for new trial. We overrule Zieger's third issue.

### Jury Charge

In his fourth issue on appeal, Zieger contends that the trial court erred in submitting a broad-form jury charge. Zieger contends that a narrow-form charge was necessary to ensure that if ten or more jurors agreed that Zieger's rights should be terminated, they all agreed on the same ground or grounds out of the four subsections of 161.001(1) that the jury was asked to consider. Although the jury charge stated that Zieger's parental rights to T.P.Z. could be terminated if clear and convincing evidence established one of four grounds for termination, the charge asked in a broad-form question simply whether Zieger's rights to T.P.Z. should be terminated. In the charge's general instructions, the jury was instructed that "[t]he same ten or more of you must agree upon all the answers made and to the entire verdict."

17

We first must address whether Zieger preserved error. *See In re B.L.D.*, 113 S.W.3d 340, 349-350 (Tex. 2003) (emphasizing importance of preservation rules). At trial, Zieger complained that the broad-form submission allowed less than ten jurors to agree on a ground for termination, making it impossible for Zieger to know upon which ground his rights had been terminated. However, Zieger did not object that the broad-form submission allowed the submission of an invalid legal theory or a ground for termination for which there was no evidence, much less specify which ground for termination was improperly submitted. *Cf. Harris County v. Smith*, 96 S.W.3d 230, 231 (objection to specific element of damages as being unsupported by any evidence) (cited by *In re B. L. D.*, 113 S.W.3d at 349-50). All that Zieger's objection preserved is a general objection to the use of broad-form submission in termination cases; it is essentially an argument against following *Texas Department of Human Services v. E. B.*

In *Texas Department of Human Services v. E.B.*, the supreme court approved of the use of broad-form questions in termination cases:

> The charge in parental rights cases should be the same as in other civil cases. *The controlling question in this case was whether the parent-child relationship between the mother and each of her two children should be terminated, not what specific ground or grounds . . . the jury relied on to answer affirmatively the questions posed.* All ten jurors agree that the mother had endangered the child by doing one or the other of the things listed in [the termination statute]. . . . The standard for review of the charge is abuse of discretion, and abuse of discretion occurs only when the trial court acts without reference to any guiding principle. Here the trial court tracked the statutory language in the instruction and then asked the controlling question. This simply does not amount to abuse of discretion.

802 S.W.2d 647, 649 (Tex. 1990) (emphasis added).

18

Only the supreme court may revisit the issue and hold that in termination cases due process requires that the same ten jurors must agree on the ground or grounds to support termination of parental rights.[8] *See Carr v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-03-00272-CV, (Tex. App.—Austin Jan. 8, 2004, pet. denied). Absent such guidance from the supreme court, we may not depart from *E.B.*'s clear holding that broad form submissions such as the one in this case are proper. *See id.; In re J.M.M.*, 80 S.W.3d 232, 249-50 (Tex. App.—Fort Worth 2002, pet. denied); *In re K.S.*, 76 S.W.3d 36, 48-49 (Tex. App.—Amarillo 2002, no pet.); *see also Cox v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-01-00511-CV, 2002 Tex. App. LEXIS 3651, at *7 n.3 (Austin May 23, 2002, pet. denied) (not designated for publication) (holding that *Casteel*[9] does not apply in cases where disjunctive allegations track statutory language, as charge does in this case). Finally, absent evidence to the contrary, we presume that the jury followed the trial court's instructions that the same ten or more of them must agree on the verdict and all the answers made. *In re J.M.M.*, 80 S.W.3d at 250.

We overrule Zieger's fourth issue.

---

[8]    In a recent case, in its discussion of unpreserved error, the Texas Supreme Court noted that the charge in the termination case followed the precedent in *E.B.*, tracked the statutory language of the Family Code, and comported with Texas Rules of Civil Procedure 277 and 292. *In re B.L.D.*, 113 S.W.3d 340, 354-55 (Tex. 2003), *overruling on other grounds*, 56 S.W.3d 203, 203 (Tex. App.—Waco 2001) (under circumstances of case, court should not have reviewed unpreserved charge error). *E.B.* was one of the cases cited by *Harris County v. Smith* in its discussion of the supreme court's commitment to broad-form submission. 96 S.W.3d 230, 235 (Tex. 2002).

[9]    *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000). Zieger did not raise a *Casteel*-based argument.

19

### Ineffective Assistance of Counsel

In his fifth issue, Zieger contends that he received ineffective assistance of counsel. The test for effective assistance of counsel as articulated by the United States Supreme Court has been adopted by the Texas Supreme Court for parental-rights termination cases. *See In re M.S.*, 115 S.W.3d 534, 544-45 (Tex. 2003) (adopting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). In order to prevail on an ineffective-assistance claim, a convicted defendant must show both that counsel's performance was deficient—which requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment—and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Counsel's performance falls below acceptable levels of performance when the representation is so grossly deficient as to render proceedings unfair. *Strickland*, 466 U.S. at 687; *In re M.S.*, 115 S.W.3d at 545. The reviewing court must give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *In re M.S.*, 115 S.W.3d at 545; *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). Only when the conduct of counsel is so outrageous that no competent attorney would have engaged in it does the challenged conduct constitute ineffective assistance. *In re M.S.*, 115 S.W.3d 545. We analyze the "totality of the representation" rather than isolated acts or omissions of trial counsel. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *In re K.L.*, 91 S.W.3d 1, 14 (Tex. App.—Fort Worth 2002, no pet.). The litigant is not entitled to errorless or perfect counsel. *See Hines v. State*, 144 S.W.3d 90, 96 (Tex. App.—Fort Worth 2004); *see also Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990) (entitled to fair, not perfect, trial).

20

The second prong requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial. *Id*. Prejudice is demonstrated when the convicted defendant shows "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

Zieger points to several specific instances that he claims demonstrates ineffective assistance. He first claims that counsel challenged venirepersons for cause when he was not entitled to challenge them for cause. He bases his claim on the fact that the judge ruled against the challenges. However, he fails to demonstrate how counsel's performance was deficient. If counsel tries to remove a juror for cause, and is successful, he has preserved a peremptory challenge for use on another venireperson. If unsuccessful, the litigant suffers no penalty. Counsel's conduct is reasonable trial strategy. Further, Zieger does not complain of the denial of any of the challenges for cause or complain that he was forced to accept a juror he did not want.

Zieger also complains that counsel failed to elicit statements to establish bias on the part of certain venirepersons. He specifically points to juror Robinson. He contends that she was biased because she would base a decision solely on the best interest of the child. The record reflects that Robinson never said she would ignore the state of proof on the section 161.001(1) factors and decide based only on the best interests of the child. She said if there were abuse or neglect involved, then she "was for the child." Similarly, juror Petterson never stated she would not require the Department to meet its burden of proof; she simply said that her instinct was to side with the child. Counsel's task is not to create bias; it is simply to discover whether it exists.

Zieger also complains that counsel failed to properly object to the jury charge with regard to 161.001(1)(Q). His argument centers around the contention that the court improperly used

the date of the original petition, not the amended petition. However, Zieger was not scheduled for his mandatory release before 2008; had never been released before the mandatory date; and had a long criminal record. Neither possible date available to use in the charge would negate the applicability of section Q.

Neither the individual "errors" claimed by Zieger nor their totality were enough to demonstrate that counsel's conduct fell outside the wide range of professional assistance. *See In re M.S.*, 115 S.W.3d at 545. Counsel's alleged errors were not so serious as to deprive the defendant of a fair trial. *Id*. We overrule Zieger's fifth issue.

## Conclusion

We have reviewed the evidence and hold that legally and factually sufficient evidence supports the termination. We have overruled Zieger's other issues and affirm the trial court's judgment.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   August 25, 2005